**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALEA HOLDINGS US COMPANY, *et al.,*[1] | Case No. 26-90714 (CML) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF PETER KRAVITZ
IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS
AND FIRST DAY PLEADINGS**

I, Peter Kravitz, hereby declare under penalty of perjury as follows:

1.      I was engaged as Chief Restructuring Officer of each of the debtors in these chapter 11 cases ("Debtors") on January 23, 2025. Since first commencing work for the Debtors, I have acquired, both personally and in reliance on my team serving in a capacity as financial advisor to the Debtors, significant knowledge of the Debtors, their businesses, and the circumstances that led to the commencement of these chapter 11 cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.

2.      I am currently a partner at Province, LLC ("Province"), an advisory firm I co-founded that provides companies with growth opportunities, corporate restructurings, and fiduciary-related services. I have over thirty years of experience in professional services, with a specific focus in wind-down situations with a strong track record of maximizing recoveries. I have held a variety of roles in my career, including Chief Restructuring Officer, a member of bankruptcy

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification numbers, are: Alea Holdings US Company (6256); Alea Group Holdings (Bermuda) Ltd. (N/A); and FIN Alea LLC (7772).  The Debtors' service address is 211 E. 7th Street, Suite 620, Austin, TX 78701.

oversight and creditor committees, the trustee for liquidating and litigation trusts, a plan administrator, a disbursing agent, and advisor to and member of various boards of directors. Prior to founding Province, I served as Executive Vice President of Business Affairs to the largest privately held RV dealership group, and was a practicing commercial litigator with a specific focus on bankruptcy, litigation, and trusts.

3.        On the date hereof (the "Petition Date"), the Debtors commenced in the United States Bankruptcy Court for the Southern District of Texas (the "Court") voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions for relief and the motions, applications, and other pleadings that the Debtors filed with the Court described herein (collectively, the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors.

4.        Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management team, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, and my discussions with professionals from the Debtors' restructuring advisors, including Sidley Austin LLP ("Sidley") as global counsel to the Debtors and my firm, Province LLC, as financial advisor, (collectively the "Advisors"). If called upon to testify, I could and would testify to the facts set forth herein on that basis.

5.        This Declaration is organized into four sections. Section I provides an overview of the Debtors and these chapter 11 cases. Section II provides background information on the Debtors' business and capital structure. Section III describes the events leading to the commencement of the chapter 11 cases and the Debtors' prepetition restructuring efforts.

2

Section IV summarizes the relief requested in, and the legal and factual bases supporting, the First Day Pleadings.

## I.      Overview

6.      The Debtors — Alea Holdings US Company ("AHUSCO"), FIN Alea LLC ("FIN"), and Alea Group Holdings (Bermuda) Ltd. ("AGHBL") — are holding companies that are indirect subsidiaries of Catalina Holdings (Bermuda) Ltd. ("Catalina Holdings") and part of the broader "Catalina Re" group. The Debtors' primary function is to hold and oversee their non-Debtor insurance subsidiaries (SPARTA Insurance Company ("SPARTA"), a Connecticut-regulated entity, Alea North America Insurance Company ("ANAIC"), a New York-regulated entity, and National American Insurance Company of California ("NAICC"), a California-regulated entity, and a dormant entity, QLT Buffalo LLC) in their performance of a wide variety of activities, including establishing reserves, negotiating settlements, paying outstanding insurance claims, and managing regulatory and capital requirements.

7.      The Debtors' business operated on a largely stable and profitable basis following Catalina Holdings' 2014 acquisition of the Alea group. Beginning in May 2020, however, the Debtors faced a significant unanticipated liability when SPARTA took on payment of certain insurance claims because another insurer defaulted on its obligations and was liquidated. Since late 2021, SPARTA has made over $100 million in claim and loss payments, while litigating against the entity that it asserted retained the obligation to pay the claims following the other insurer's insolvency.

8.      To fund SPARTA's litigation and claim payments as well as other general operating expenses, AHUSCO obtained a senior secured revolving credit facility provided by Catalina Finance LLP ("CatFin," or the "Prepetition Facility Lender" and "Prepetition Facility

Agent"), established in July 2023 with an initial $100 million commitment (later increased to $150 million and then to $160 million), and fully drawn as of the Petition Date. AHUSCO on-lent approximately $135 million to SPARTA in exchange for surplus notes, which are subordinated to all policyholder and creditor claims and require regulatory approval for repayment.  As further described below, SPARTA was ultimately successful in its litigation path, and reached a favorable settlement with the counterparty that will effectively relieve SPARTA from the need to fund future claims payments and provide for reimbursement, though partial, to SPARTA for claims paid to date.

9. The Debtors also sought to manage through the business disruption by suspending interest payments on certain subordinated, unsecured notes claims (as further defined and described below, the "TruPS"), which had been issued in 2004 (when AHUSCO was under different ownership). AHUSCO also sought buyers for its two other operating subsidiaries, ANAIC and NAICC, ultimately culminating in successful sales that are substantially complete and expected to close in the third quarter of 2026, subject to Court approval, with sale proceeds serving as the primary source of recovery for impaired creditors.

10. In light of the significant pressure on the Debtors' business and the likelihood of a need to restructure their financial obligations, the Debtors began exploring strategic options. On July 24, 2025, each of the Debtors appointed Pamela Corrie as independent director and established a Special Committee comprised solely of the Independent Director to review strategic options and investigate, evaluate, and settle or prosecute any potential causes of action.  Ms. Corrie, with the assistance of separate outside counsel, conducted a robust investigation involving review of thousands of pages of documents and interviews with key parties. She also actively participated

in Board meetings and provided an independent review and recommendation with respect to all decisions taken by the Board since her appointment.

11.     The Debtors, with the assistance of myself and my team at Province and the Debtors' counsel at Sidley, also engaged in lengthy negotiations with the authorized agents for parties who hold or can control a majority of the TruPS (as further defined and described below, "Hildene"). Though Hildene's initial position was adversarial, the Debtors' management and advisor teams worked vigorously over the course of nearly 18 months to drive toward a consensual and value-maximizing solution, in light of the Debtors' liabilities, the prospects of recovery from their insurance subsidiaries, and an overriding goal to protect policyholders.

12.     The result of those discussions is these chapter 11 cases, which are commenced pursuant to a *Restructuring Support Agreement* dated June 8, 2026 (the "RSA"), among the Debtors, Hildene, and the Prepetition Facility Lender. The RSA provides for a consensual pay-back and discharge of the TruPS claims in exchange for either $25 million (if 100% of TruPS holders tendered into an out-of-court exchange) or a $20 million cash pool pursuant to a consensual chapter 11 plan.  The tender offer was launched June 11, 2026, with Hildene and the Prepetition Facility Lender tendering their TruPS (which together constitute approximately 60% of the TruPS).  Although no TruPS holders raised any opposition to the tender offer, the other holders did not respond and participation ultimately fell short of the 100% threshold.

13.     The Debtors therefore filed these cases to implement the RSA's consensual transactions, including (i) the distribution of the $20 million cash pool to the TruPS holders (exclusive of the TruPS claims held by the Prepetition Facility Lender and a reallocation of such distribution to other TruPS holders *pro rata*, (ii) the treatment of the Prepetition Facility Lender's claims through a combination of cash repayment, replacement debt, reinstatement, and/or an equity

conversion or capital contribution, and (iii) the continued operation and runoff of SPARTA and, if applicable, consummation of the ANAIC and NAICC sales on a free and clear basis.

14.     The Debtors intend to move swiftly through these cases to implement the negotiated resolution with respect to the TruPS and position the Debtors to continue the orderly run-off of their insurance businesses. The Debtors' goal is to consummate the restructuring prior to the end of the third quarter, subject to Court approval of the proposed bankruptcy plan filed concurrently herewith (the "Plan"):

| Hearing / Deadline | Date |
|---|---|
| First Day Hearing<br>    Entry of Interim Orders, Bar Date Order,<br>    Conditional DS / Solicitation Procedures Order | July 20, 2026 |
| Targeted Mailing of Bar Date Notice and Solicitation Commencement | July 23, 2026 |
| Targeted Second Day Hearing<br>    Entry of Final Financing Order<br>    Hearing on Private Sale Motion | August 13, 2026 |
| General Bar Date | August 26, 2026 |
| Voting / Opt-Out Deadline<br>Deadline to Object to Plan / Final DS Approval | September 2, 2026 |
| Combined Hearing on Plan / Final DS Approval | September 10, 2026 |
| Anticipated Effective Date | By end of Q3, 2026 |

## II.     The Debtors' History, Corporate and Capital Structure

### A.     The Debtors.

15.     The Debtors trace their roots back to KKR's 1997 purchase of Swiss reinsurer Rhine Re, a deal that launched the global "Alea" franchise, as a multiline insurer-reinsurer with alternative-risk expertise. Catastrophic hurricane losses in 2004 to 2005, however, triggered rating downgrades that forced the entire Alea group into a solvent run-off in late-2005.   Fortress

Investment Group ("Fortress") stepped in during 2007, buying the distressed parent and maintaining AHUSCO primarily as a runoff vehicle.

16.     In 2014, non-Debtor Catalina Holdings completed the purchase of the entire Alea group from Fortress, turning AHUSCO into its intermediate U.S. holding platform.  AHUSCO then resumed deal-making.    Already holding ANAIC, AHUSCO acquired SPARTA Insurance Group (a Connecticut-licensed insurance entity, later renamed to SPARTA Insurance Company) and NAICC in 2014. In 2015, QLT Buffalo LLC became a wholly owned subsidiary of AHUSCO, through a merger between AHUSCO and Quanta U.S. Holdings Inc. In 2025, AHUSCO and FIN redomiciled to Texas.

17.     Today, AHUSCO oversees its subsidiaries in running off claims including asbestos, hazardous waste, talc, PFAS, workers' compensation claims, and sexual-abuse claims, as well as capital management and regulatory reporting for its subsidiaries.



B.   **Debtors' Prepetition Capital Structure**

18.   The Debtors' funded debt obligations consist of a $160 million secured revolving credit facility provided by the Prepetition Facility Lender, an indirect subsidiary of Catalina Holdings, and subordinated deferrable interest debentures issued to three Delaware statutory trusts which in turn issued junior subordinated capital securities.

| Funded Debt | Maturity | Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| **Prepetition Facility** | | |
| • Revolving Credit Facility | July 2027 | $159,850,000.00 |
| **TruPS** | | |
| • AHUSCO Trust I | December 15, 2034 | $50,000,000.00 |
| • AHUSCO Trust II | March 15, 2035 | $50,000,000.00 |
| • AHUSCO Trust III | March 15, 2035 | $20,000,000.00 |
| | **Total Funded Debt:** | Approximately $280,000,000.00 |

19.   *TruPS.*  In 2004, while still owned by Rhine Re, AHUSCO issued $120,000,000 of New York-law-governed junior subordinated deferrable interest debentures due 2034 and 2035 in a total of three (3) separate tranches (the "Debentures") to three Delaware statutory trusts: AHUSCO Statutory Trust I, AHUSCO Statutory Trust II, and AHUSCO Statutory Trust III (the "AHUSCO Trusts").[2]  The AHUSCO Trusts in turn issued trust preferred securities to third parties (such securities, the "Capital Securities", and such holders, the "TruPS Holders").[3]



---

[2]   Wilmington Trust Company serves as the trustee of the AHUSCO Trusts and the indenture trustee for the Capital Securities (in such capacity, the "Indenture Trustee").

[3]   Any claim against the Debtors under the Debentures, the Capital Securities, or the related guarantee, indemnity, or other related arrangements are collectively referred to as the "TruPS Claims."

20.     This structure permitted AHUSCO to raise capital while obtaining favorable tax treatment and other financing benefits available under the legal and regulatory framework then in effect. Both FIN and AHUSCO have issued subordinated unsecured guarantees on these Debentures, which provide for a direct right of payment to the holders of the Debentures upon certain specified trigger conditions. AGHBL has also issued a similar but separate "parent guarantee."

21.     The Capital Securities entitle the TruPS Holders to periodic interest payments, but apart from that, carry few other rights or obligations. The Debentures carry no financial covenants or cross default covenants. Additionally, TruPS Holders may not call the securities prior to their maturity dates. Interest was paid on the Debentures from 2004 through 2023 in an approximate aggregate amount of $84 million. During 2023, AHUSCO elected, under the terms of the Debentures, to defer interest payments, and notified the trustees of the AHUSCO Trusts of its intention to defer interest payments for up to twenty consecutive quarters, i.e., through as late as May, 2028.

22.     In 2024, CatFin launched a tender offer for the TruPS at a price of $10 per $100 of principal.  $10 million of principal amount of Capital Securities were tendered in and acquired for $1 million, which are still held by CatFin.

23.     In February 2025, the Debtors received a letter from Hildene Capital Management, LLC and its affiliates ("Hildene"), represented by Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), purporting to speak on behalf of certain holders of outstanding Capital Securities. Hildene alleged various claims and threatened litigation against the Debtors, which the Debtors disputed. The Debtors and Hildene exchanged various letters throughout 2025. In December 2025, Mr. Hessler of Sidley and I met with Hildene's counsel from Quinn Emanuel for

the first of a series of education and negotiation sessions. Over the following months, negotiations continued, ultimately resulting in the RSA (more fully described below), which is supported by Hildene, in its capacity as the direct holder or manager of $60 million in TruPS Claims. Given the nature of the TruPS Claims, the Debtors do not know the identity of any other direct TruPS Holder, and all communication with TruPS Holders is managed through the AHUSCO Trusts' Indenture Trustee as well as the Depository Trust Company through which the TruPS are held.

24.     ***Prepetition Facility.***  On July 25, 2023, AHUSCO secured capital under an English law-governed secured revolving credit facility, in the amount of $100,000,000 (the "Prepetition Facility") pursuant to that certain *Revolving Facility Agreement*, dated as of July 25, 2023 by and among AHUSCO, as borrower, FIN as guarantor, (together, the "Prepetition Obligors") the lenders from time to time party thereto (which have been since the inception of the Prepetition Facility, CatFin), and the Prepetition Facility Agent, as administrative agent and security trustee (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Facility Agreement"). The Prepetition Facility Agreement contains certain financial covenants and cross default covenants, and the Prepetition Facility is secured by a lien on all of the Prepetition Obligors' assets, including the stock in AHUSCO's subsidiaries, intercompany claims, and cash. The Prepetition Facility matures in July 2027.

25.     CatFin was represented in the negotiation of the Prepetition Facility Agreement, and continues to be represented, by White & Case LLP. Prior to entry into the Prepetition Facility, AHUSCO obtained a third-party fairness opinion, which concluded that the terms of the Prepetition Facility Agreement were consistent with an arm's-length, commercial lending relationship. There is no overlap between the management of CatFin and that of the Debtors, and

the Debtors and CatFin have negotiated, through their advisors, on an arm's-length basis throughout.

26.    On July 25, 2023, AHUSCO drew $40.0 million in principal under the Prepetition Facility. On October 25, 2023, accrued interest and a commitment fee of $2.6 million were capitalized into additional principal. On December 27, 2023, AHUSCO drew an additional $30.0 million in principal. Additionally, commitment fees and accrued interest under the Prepetition Facility were capitalized as notes payable (the "Prepetition Facility Notes"). The principal balance on the Prepetition Facility Notes was $15.2 million as of December 31, 2024.

27.    On June 20, 2024, the parties amended and restated the Prepetition Facility Agreement to increase the Prepetition Facility's aggregate commitment to $150.0 million. In 2024, AHUSCO borrowed an additional $38.5 million in principal, bringing the principal balance of the Prepetition Facility to $108.5 million as of December 31, 2024. AHUSCO also incurred $19.3 million in interest expense for the Prepetition Facility in 2024, which amount was also added to principal.

28.    On June 30, 2026, the parties amended the Prepetition Facility Agreement again to increase capacity to $160.0 million (essentially, a loan to bridge the Debtors from the expiration of the tender offer to these bankruptcy cases), which was nearly fully drawn as of the Petition Date.

29.    When including accrued and unpaid interest (including the Prepetition Facility Notes issued in satisfaction of accrued interest pursuant to the payment-in-kind mechanics of the Prepetition Facility Agreement), fees, and other amounts owing under the Prepetition Facility Documents, the aggregate amount outstanding under the Prepetition Facility as of the Petition Date is more than $230 million.

| Date | Total RCF Commitment | Draw | Outstanding Balance | Annual Commitment Fees and Accrued Interest | Total Outstanding Balance |
|---|---|---|---|---|---|
| July 25, 2023 | $100,000,000 | $40,000,000 | $40,000,000 | $0 | $40,000,000 |
| December 31, 2023 | $100,000,000 | $30,000,000 | $70,000,000 | $4,543,265 | $74,543,265 |
| December 31, 2024 | $150,000,000 | $38,500,000 | $108,500,000 | $25,626,015 | $134,126,015 |
| December 31, 2025 | $150,000,000 | $28,850,000 | $137,500,000 | $52,932,761 | $190,282,761 |
| May 31, 2026 | $150,000,000 | $10,500,000 | $147,850,000 | $66,737,505 | $214,587,505 |
| Petition Date | $160,000,000 | $12,000,000 | $159,850,000 | $71,185,190 | $231,035,190 |

30.     The Prepetition Facility Agreement was further amended prior to the Petition Date to allow access to an additional $35 million in postpetition financing (*i.e.*, a debtor-in-possession financing facility).  Access to this additional financing will permit the Debtors to consummate the transactions contemplated by the Plan, as further described in Section IV.H herein.

31.     ***Intercompany Relationships.***   The Debtors have no other third-party general unsecured claims against them, as all other services are provided either by advisors (*e.g.*, specialty legal, tax, and audit), who have been paid in full, or by the Debtors' affiliates pursuant to intercompany relationships. In the ordinary course of business, the Debtors routinely engage in Intercompany Transactions (as defined in Section IV.C) with one another and their non-Debtor affiliates that result in intercompany receivables and payables, which are generally settled annually. In particular, AHUSCO is party to an Administrative Service Agreement (as defined below in Section IV.C) pursuant to which it obtains services from certain of its non-Debtor affiliates. The primary non-Debtor entity providing services to AHUSCO is Catalina U.S.

Insurance Services LLC ("CUSIS"), which provides personnel, tax, and audit services, among other services.[4] All services are billed at-cost.

### III.   Events Leading to Commencement of the Chapter 11 Cases and Chapter 11 Goals.

#### A.   SPARTA Liabilities

32.   As described above, the Debtors have operated for approximately a decade as intermediate holding companies for their subsidiaries' run-off insurance businesses. This business had largely been stable and profitable. However, in May of 2020, the Debtors' subsidiary, SPARTA, was faced with an existential liability. The history of the transactions leading to the event is convoluted and complicated, but a brief overview is necessary.

33.   Prior to AHUSCO's acquisition of SPARTA, SPARTA was a subsidiary of SPARTA Insurance Holdings, Inc. ("SIH"). In 2007, SPARTA acquired American Employers Insurance Company ("AEIC") through what is known in the insurance industry as a "clean shell" purchase – *i.e.*, a purchase of an insurance company that is no longer writing insurance policies and has no remaining insurance liabilities, but which does have insurance licenses in multiple jurisdictions.  Before the purchase, AEIC itself had liabilities that were previously transferred to its direct parent company, Pennsylvania General Insurance Company, subsequently renamed Pennsylvania Insurance Company ("PIC") which is now indirectly owned by Applied Underwriters, Inc.

34.   In 2014, AHUSCO acquired SIH and its wholly owned subsidiaries, including SPARTA. Effective October 9, 2015, SIH was merged into SPARTA after receiving approval from the Connecticut Insurance Department and the Secretary of the State of Connecticut. Following the acquisition, SPARTA resumed writing insurance policies.

---

[4]   During 2014, CUSIS was formed to provide claims handling services to affiliated insurance companies. CUSIS also became the employer for all of Catalina Re's U.S. employees, effective January 1, 2015.

35.     On May 1, 2020, SPARTA was notified that Bedivere Insurance Company ("Bedivere"), which had assumed the handling and paying of claims on the legacy AEIC policies from PIC, had been placed into liquidation in Pennsylvania. In connection with the liquidation, the Pennsylvania liquidator disclaimed Bedivere's and its related subsidiaries' continued responsibility for handling and paying claims on the legacy AEIC policies.  Since late 2021, SPARTA, under a full reservation of rights, has been paying (via a third-party administrator) claims tendered against pre-2007 AEIC policies pending the outcome of litigation against PIC (discussed further below).[5] From inception to date, SPARTA has made approximately $114.3 million in claim handling and loss payments.[6]

36.     On July 26, 2021, SPARTA filed a complaint against PIC to enforce PIC's obligation to manage and pay the AEIC claims in accordance with PIC's contractual obligations to SPARTA, and for indemnification, in the United States District Court for the District of Massachusetts.[7] On September 30, 2025, on SPARTA's motion for summary judgment, the Court entered judgment in favor of SPARTA on two of its four claims, concluding that PIC bore ultimate responsibility for payment of the AEIC claims, leaving for further determination only the calculation of damages.

---

[5]   The Bedivere liquidator reserved its rights against SPARTA to the extent Bedivere's former subsidiary, PIC refused to accept responsibility for the claims and/or lacked sufficient funds to pay them. PIC has taken the position that it is not responsible for the claims.

[6]   One particular settlement is worth highlighting.   Following the financial and legal fallout from a large number of clergy sexual-abuse claims, on May 1, 2020, the Roman Catholic Church of the Archdiocese of New Orleans ("ADNO") filed for Chapter 11 bankruptcy. *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La. May 1, 2020). During the bankruptcy process, ADNO and its tort claimants' committee asserted that SPARTA was obligated to satisfy claims arising under legacy AEIC insurance policies, with a liability demand at one point of over $360 million. Although SPARTA disputed any coverage obligation, it ultimately settled with ADNO for a total of $21 million, in exchange for a complete buy back and release of the policy. SPARTA served as the lead insurer driving the insurance settlements which were integral to ADNO's successful exit from its bankruptcy.

[7]   *Sparta Insurance Company v. Pennsylvania General Insurance Company*, No. 21-11205 (D. Mass.).

37.     In April of 2026, SPARTA and PIC reached a confidential settlement in principle regarding these legacy liabilities, pursuant to which SPARTA retains certain ongoing obligations to pay claims.  Any amounts paid to SPARTA as part of the settlement are expected to remain available exclusively to SPARTA as part of the ongoing regulatory capital requirements of the Insurance Commissioner of the Connecticut Insurance Department, and are subject to specified release conditions.

38.     In order to support the continued litigation against PIC as well as to fund the general operating expenses and payment of claims of SPARTA, AHUSCO has had to make several draws on the Prepetition Facility, as detailed above. AHUSCO then on-lent to SPARTA $134.9 million. In exchange, SPARTA issued a series of surplus notes to AHUSCO totaling approximately $179.0 million (including contractual interest thereon). The maturity dates of the surplus notes are varying dates in 2033 and 2034. The surplus notes are subordinated, including to claims by policyholders, claimants and beneficiaries.

**B.      Ongoing Sales of Debtor AHUSCO's Subsidiaries**

39.     In the face of these challenges, the Debtors have remained vigilant in their efforts to effectuate value-maximizing transactions to stabilize their businesses and effectuate an orderly run-off of the AHUSCO group insurance liabilities. In furtherance of these efforts, prior to the Petition Date, the Debtors undertook processes to sell ANAIC and NAICC, their two other operating subsidiaries.[8]

---

[8]     Further information regarding the ANAIC and NAICC sales can be found in the *Debtors' Motion for Entry of an Order (I) Approving the Private Sale of the ANAIC and NAICC Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief* filed contemporaneously herewith, and my declaration in support of the same.  Given the nature of the pending sales, and the Debtors' confidentiality obligations, the Private Sale Motion and related declaration are subject to a request to sealing and/or redaction.

40.     Beginning several years ago, AHUSCO began a marketing process in which it sought to identify a purchaser for ANAIC, against the backdrop of regulatory approval considerations that limited the range of viable transaction structures. AHUSCO engaged with multiple prospective purchasers over this several-year process. On June 6, 2025, AHUSCO agreed to a sale of the stock of ANAIC to a third-party U.S.-based specialty insurance and reinsurance company.   The transaction is subject to regulatory approval, following which it could be immediately consummated, subject to approval of the Court.

41.     Similarly, AHUSCO has also spent several years seeking a purchaser for NAICC, made more challenging by NAICC's relatively small asset value and certain liabilities.  Ultimately, AHUSCO also was able to secure a purchaser for the stock of NAICC, which is also in a position to close following regulatory approval.

42.     The ANAIC and NAICC sales were determined by AHUSCO's management and board to be the best achievable in light of the circumstances, and will, if consummated, provide value to the Debtors' estates and provide funding for distributions under the Plan.

**C.     Exploration of Strategic Options**

43.     In addition to the sales of AHUSCO's subsidiaries, the Debtors also instituted certain governance changes as part of their exploration of strategic options and proactively engaged in discussions with certain of their creditors, which resulted in the execution of the RSA and commencement of these chapter 11 cases.  In particular, although the Debtors are part of the broader Catalina Re group, the Debtors have acted through their own governing bodies, officers, and advisors in evaluating and pursuing the restructuring transactions described herein. The Debtors' decisions to enter into the RSA, commence these cases, and pursue the Plan were made

after consideration of available alternatives and with the benefit of advice from their restructuring and legal advisors, and independent director, Ms. Corrie, as described more fully below.

44. ***Independent Director***. On July 24, 2025, each of the Debtors appointed Pamela Corrie (the "Independent Director") as an independent director on its respective board of directors and established a special committee (the "Special Committee") comprised solely of the Independent Director to review and recommend strategic options with respect to the Debtors and investigate, evaluate, and settle or prosecute any potential causes of action held by the Debtors. With the assistance of separate outside counsel from the firm of Greenberg Traurig, LLP, Ms. Corrie conducted a thorough and independent investigation, which included the review of thousands of pages of documents and other relevant materials, as well as interviews of key individuals with knowledge of the matters under review. Since her appointment, Ms. Corrie has also actively participated in meetings of the Board, independently evaluated the matters presented for the Board's consideration, and provided her own analysis and recommendations with respect to each material action and decision considered and taken by the Board. In particular, Ms. Corrie recommended and approved the Debtors' entry into the RSA, the launch of the tender offer (described below), and the commencement of these chapter 11 cases and pursuit of the Plan.

45. ***Restructuring Support Agreement.*** With the assistance of their advisors, including me as Chief Restructuring Officer and Sidley as legal counsel, and under the oversight of the Special Committee and the Debtors' boards of directors, the Debtors engaged in discussions with Hildene regarding a consensual deal with respect to the TruPS, given the Debtors' financial distress. The Debtors also negotiated with the Prepetition Facility Lender to secure additional liquidity to facilitate any transaction with respect to the TruPS and provide the Debtors with a liquidity bridge through the ANAIC and NAICC sale closings.

17

46. These multi-party negotiations continued for several months, and culminated in an agreement memorialized in the RSA between the Debtors, the Prepetition Facility Lender, and Hildene. The RSA encapsulates a very simple deal construct:

a. TruPS Holders would receive $25 million if 100% of the TruPS were tendered in an out-of-court Tender Offer;

b. If 100% consent was not achieved out of court, Hildene would vote in favor of a chapter 11 plan which provides for a $20 million cash pool for TruPS Holders, waiver of any right to a distribution from the cash pool by the Prepetition Facility Lender as a holder of TruPS, and is otherwise consistent with the RSA; and

c. In both scenarios, TruPS Holders would provide (whether by tendering in or through an opt-out mechanism under a chapter 11 plan) full and complete releases to the Debtors and CatFin and their respective related parties.

47. In accordance with the RSA, AHUSCO launched the tender offer on June 11, 2026. Despite the Debtors' coordinated efforts with Hildene to encourage all other TruPS Holders to tender their Capital Securities, the tender offer fell short of its 100% participation threshold. Pursuant to the RSA, the Debtors are now filing these chapter 11 cases to consummate the consensual, value-maximizing transactions set forth therein and seek swift confirmation of the Plan.

***

48. Accordingly, following years of concerted effort and many twists and turns, and with the support of all of their known financial stakeholders, the Debtors seek the Court's assistance to guide a process by which the Debtors can address their liabilities, maximize the value

of their assets, and pursue the orderly runoff of their insurance portfolio. The Debtors hope and anticipate that these cases will proceed smoothly and efficiently, and that they will emerge during the third quarter of 2026 with the certainty and clarity that only chapter 11 can provide.

## IV.      Requested Relief

49.      Contemporaneously herewith, the Debtors have filed several "first day" pleadings. Due to the Debtors' limited operations, these pleadings are comprised of one operational motion alongside several standard procedural motions. Additionally, the Debtors seek authority to use existing cash on hand, pursuant to an agreed cash collateral order with the Prepetition Facility Agent, subject to the ability to make additional draws if and as needed on a final basis. The Debtors also seek conditional approval of the disclosure statement accompanying their proposed Plan, to allow swift solicitation of votes thereon.

50.      The Debtors anticipate seeking relief on the following on an emergency basis:

a.      "Joint Administration Motion":  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

b.      "Claims Agent Retention Application": *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions as Claims, Noticing, and Solicitation Agent.*

c.      "Creditor Matrix Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated (1) Creditor Matrix and (2) Top Thirty Creditors List, (B) Redact Certain Personal Information; (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases; and (III) Granting Related Relief.*

d.      "Omnibus Relief Motion": *Debtors' Emergency Omnibus Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate and Maintain Their Existing Bank Account and Use Existing Books and Records; (B) Continue to Perform Intercompany Transactions; and (C) Pay Prepetition Taxes and Fees, (II) Confirming that the Non-Debtor Insurance Subsidiaries are Not Affected or Impaired by the Chapter 11 Cases; and (III) Granting Related Relief.*

e. "Conditional Approval of Disclosure Statement, Plan, and Solicitation Procedures Motion": *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Deadline and Related Procedures; (IV) Approving the Solicitation Procedures; (V) Approving the Combined Notice; (VI) Extending the Deadline and Conditionally Waiving the Requirements for the Debtors to File Rule 2015.3 Financial Reports; and (VII) Granting Related Relief.*

f. "Bar Date Motion": *Debtors' Emergency Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving Notice of Bar Dates; and (IV) Granting Related Relief.*

g. "Financing Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (II) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code; (III) Granting Adequate Protection to Prepetition Facility Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief.*

51. The Debtors have also filed the Private Sale Motion and related sealing motion with respect to the ANAIC and NAICC sales, to be heard at the anticipated "second day" hearing. The Debtors further anticipate filing their schedules and statements and retention applications shortly after the Petition Date. Barring unforeseen circumstances, the Debtors do not anticipate needing additional relief, nor do the Debtors anticipate the appointment of an unsecured creditors' committee.

## A. Notice of Designation as Complex Case

52. Pursuant to the Notice of Designation as Complex Case, the Debtors seek to have these chapter 11 cases designated as complex chapter 11 cases.

53. The proposed counsel for the Debtors believes that these chapter 11 cases qualify as complex chapter 11 cases because the Debtors have total debt of more than $10 million. For this reason, I believe that designation of these chapter 11 cases as complex chapter 11 cases is appropriate and will contribute to the efficient administration of these cases.

**B.      Joint Administration Motion**

54.      I understand that joint administration of these chapter 11 cases is procedurally efficient because such joint administration saves the Debtors and their estates substantial time and expense, by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Furthermore, I understand that joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets and will spare the U.S. Trustee the time and effort of reviewing duplicative pleadings and papers.

55.      I believe that joint administration is warranted and that consolidating these chapter 11 cases will assist the Debtors in preserving the value of the estate by avoiding duplicative expenses.

**C.      Omnibus Relief Motion**

56.      Pursuant to the Omnibus Relief Motion, the Debtors seek (i) the authority to (a) operate and maintain the existing Bank Accounts (as defined below), open new accounts, and close the existing accounts as needed; (b) continue using their existing books and records, business forms, and payment processes; (c) continue Intercompany Transactions (as defined in the Omnibus Relief Motion) consistent with the Debtors' historical practices and Intercompany Relationships (as defined below), and (d) for the Court to appoint administrative expense status to the Intercompany Transactions among the Debtors and between the Debtors and their non-Debtor affiliates and (ii) pay prepetition Taxes and Fees (as defined in the Omnibus Relief Motion), if any, as they may come due postpetition.

57.      ***Bank Accounts***.  As of the Petition Date, the Debtors have three bank accounts (each, a "Bank Account" and together the "Bank Accounts").[9]  The Debtors have two main

---

[9]      In addition, an escrow account through Western Alliance bank has been established to serve as the Carve-Out Account as provided in the Financing Orders (as defined below).

operating accounts maintained by AHUSCO, at Bank of America, N.A. ("BoA"), and by AGHBL, at US Customers Bank ("CB") (each an "Operating Bank Account"). The Debtors have approximately $7,300 in unrestricted cash in the Operating Bank Account at CB. The Debtors have approximately $3.1 million in cash in the Operating Bank Account at BoA. The BoA Operating Bank Account is subject to a deposit account control agreement in favor of CatFin as collateral for the Prepetition Facility (and the cash is also collateral therefor).

58.    AHUSCO and AGHBL use these Operating Bank Accounts to collect and disburse cash, whether generated from borrowings, investments, or from their subsidiaries, and to pay their financial obligations, which primarily consist of payments for intercompany services, including for personnel, and professional fees. Additionally, AHUSCO uses its Operating Bank Account to provide disbursements to its subsidiaries to support their operations and the payment of insurance claims.

59.    The Debtors' final Bank Account is maintained by AHUSCO also at BoA. This Bank Account is also subject to a deposit account control agreement in favor of CatFin as collateral for the Prepetition Facility. The proceeds of the sales of AHUSCO's equity interests in ANAIC and NAICC, subject to approval by this Court and the closing of such sales, will be deposited in this Bank Account. This Bank Account currently has $0, and the Debtors do not anticipate any additional funds to be deposited in this account (other than the sale proceeds of the subsidiaries).

60.    The Debtors incur periodic service charges and other fees in connection with the maintenance of their Bank Accounts (collectively, the "Bank Fees"). AGHBL is not charged any Bank Fees to maintain or operate its Main Operating Account and, accordingly, the Debtors do not believe there are any prepetition amounts due to CB on account of such Bank Account. AHUSCO does, however, incur periodic Bank Fees in connection with the deposit account control

agreements to which its Bank Accounts are subject, in an aggregate amount of approximately $1,980 per month.   Although the Debtors do not believe there are any prepetition amounts due to BoA, the Debtors seek authority to pay any prepetition Bank Fees, if any, and continue paying the Bank Fees owed to BoA, in the ordinary course on a postpetition basis.

61.     ***Books and Records***.  The Debtors maintain books and records to document their financial situation and may use certain business forms such as checks and stationery. In particular, the Debtors maintain a general ledger and enterprise resource planning system (the "<u>SUN System</u>"), which records intercompany payables and receivables, as well as cash payments and receipts. While AHUSCO does have check stock, it has not issued a physical check in several years. The other Debtors do not have check stock.  The Debtors do not have pre-printed stationery.

62.     ***Intercompany Transactions***.   In the ordinary course of business, the Debtors routinely engage in intercompany transactions (collectively, the "<u>Intercompany Transactions</u>") with one another and their non-Debtor affiliates that result in intercompany receivables and payables (collectively, the "<u>Intercompany Claims</u>").    Intercompany Transactions and Intercompany Claims arise from relationships and historical practice, or certain intercompany agreements (collectively, the "<u>Intercompany Relationships</u>" or "<u>Intercompany Agreements</u>") to support operations and shared service functions. The Debtors can ascertain, trace, and account for all Intercompany Transactions through the SUN System, and the Debtors will continue to do so on a postpetition basis.

63.     In particular, AHUSCO is party to that certain service agreement (the "<u>Administrative Service Agreement</u>") pursuant to which it obtains services from certain of its non-Debtor affiliates. The primary non-Debtor entity providing services to AHUSCO is CUSIS,

which provides personnel, tax, and audit services, among other services.  All services are billed at cost.

64.     ***Administrative Expense Status***.  Because there may be Intercompany Claims as a result of these transactions, and in order to ensure that each Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors have requested pursuant to the Omnibus Relief Motion that all postpetition Intercompany Transactions occurring in the ordinary course of business be accorded administrative-expense status. As a result of such administrative-expense status, each entity utilizing the funds flowing through the Bank Accounts will continue to bear ultimate repayment responsibility for these ordinary-course transactions.

65.     To minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, I believe the Debtors should be authorized to continue using the Bank Accounts and performing Intercompany Transactions during the course of these chapter 11 cases, with the latter being granted administrative expense status.

66.     ***Prepetition Taxes and Fees***.  Also pursuant to the Omnibus Motion, the Debtors request interim and final orders authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) prepetition Taxes and Fees (as defined below) to various federal, state, local, regulatory, and governmental authorities (collectively, the "Taxing Authorities" as further defined in the Omnibus Motion) in the ordinary course of business that are payable or become payable during these chapter 11 cases.

67.     Although almost all of their operational expenses are conducted through the Intercompany Relationships, the Debtors may be subject to a variety of business-related taxes and charges, regulatory fees, assessments and related obligations (collectively, the "Taxes and Fees").

68.     AHUSCO has not owed income taxes for several years; however, AHUSCO does file for an income tax extension. AHUSCO also pays franchise fees for itself and FIN. In September of 2025, both AHUSCO and FIN redomiciled to Texas. The Debtors believe that they are current on all Taxes and Fees, however during the pendency of this case certain Taxes and Fees may come due on account of a partial prepetition period, such as their Texas franchise taxes. To the extent that any additional prepetition amounts remain outstanding, the Debtors have requested authorization to pay them in the ordinary course.

69.     I believe the continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates. If such obligations are not timely paid, the Debtors' directors and officers may be subject to lawsuits or prosecution, the Debtors would face additional tax liability through subsequent interest charges, fees, and penalties, the Debtors' business operations may be suspended, and the Debtors will be required to expend time and money to resolve these issues. Accordingly, I believe the relief requested in connection with Taxes and Fees should be granted.

70.     ***Insurance Subsidiaries Comfort Order***   In addition, the Debtors seek entry of a "comfort order" confirming that the Debtors' insurance subsidiaries SPARTA, ANAIC, and NAICC (collectively, the "Insurance Subsidiaries") are not Debtors in, and are not affected or impaired by, these chapter 11 cases. Each Insurance Subsidiary is a separate legal entity organized and regulated under the insurance laws of its respective domiciliary jurisdiction (Connecticut, New York, and California, respectively). The Debtors believe that it would be beneficial for the Bankruptcy Court to confirm that:

- None of the Insurance Subsidiaries is a debtor in these Chapter 11 Cases;

25

- None of the Insurance Subsidiaries has commenced, or is the subject of, any case under the Bankruptcy Code or any other bankruptcy, insolvency, receivership, rehabilitation, liquidation, conservation, or similar proceeding;

- The commencement of these Chapter 11 Cases does not place the Insurance Subsidiaries, or their assets, businesses, or operations, under the supervision or control of the Bankruptcy Court;

- Except for the Debtors' equity interests in the Insurance Subsidiaries, which constitute property of the estate under section 541 of the Bankruptcy Code, the assets, businesses, and operations of the Insurance Subsidiaries are not property of the Debtors' estates; and

- Neither the Omnibus Motion nor any order granting the relief requested therein is intended to, or shall, (a) affect the separate corporate existence, governance, or day-to-day operations of any Insurance Subsidiary; (b) impair or otherwise affect the jurisdiction or authority of any insurance regulatory authority over any Insurance Subsidiary; or (c) cause any Insurance Subsidiary, or any of its assets, to become subject to the supervision or control of the Court or to be treated as property of the Debtors' estates.

**D.      Claims Agent Retention Application**

71.      Pursuant to the Claims Agent Retention Application, the Debtors seek entry to appoint Omni Agent Solutions, Inc. ("Omni") as the claims, noticing, and solicitation agent for the Debtors in these chapter 11 cases.

72.      As more fully described in the Claims Agent Retention Application, Omni will, among other tasks, (i) serve as the noticing agent to mail notices to creditors, equity security

holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the terms and conditions set forth in the Engagement Letter (as defined in the Claims Agent Retention Application).

73.     Omni's rates are competitive and reasonable. Omni has the expertise required in a complex chapter 11 case. Omni has reviewed the potential parties in interest in these chapter 11 cases and believes that neither Omni, nor any of its professionals, has any materially adverse connection to the Debtors, their creditors, or other relevant parties.

74.     The Debtors anticipate that there will be numerous parties to be noticed and that certain of these parties may file claims. The appointment of Omni as the claims and noticing agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed Plan, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Omni as the claims and noticing agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

### E.      Creditor Matrix Motion

75.     Pursuant to the Creditor Matrix Motion, the Debtors seek authority to (i) file a (a) consolidated creditor matrix and (b) top thirty creditors list, and (ii) redact certain personal identifying information and sensitive business information from the documents filed with the Court in these chapter 11 cases.

76.     It is my understanding that Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top unsecured creditors for each debtor. Because the preparation of separate lists of creditors for each Debtor would be administratively burdensome and duplicative because the Debtors' handful of creditors are largely identical, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, because of the overlap of creditors between the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor.

77.     Further, I believe that cause exists to authorize the Debtors to redact certain personal data including (i) the home addresses of individual creditors, directors, and officers of the Debtors and (ii) the names, addresses, and other Personal Data of any natural person located in the United Kingdom or a member state of the European Economic Area. Such redaction is necessary because, respectively, (x) disclosure of home address information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (y) disclosure of names, addresses, and other Personal Data risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties. Without such relief, the Debtors may be in violation of applicable data privacy laws, thereby exposing them to severe monetary penalties that could threaten the Debtors' operations during this sensitive stage of their restructuring. Furthermore, without such relief the Debtors would unnecessarily render individuals more susceptible to identity theft or could jeopardize the safety of individual creditors, directors or officers of the Debtors, who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take

protective measures.

78.     The Debtors propose that the Claims and Balloting Agent undertake all mailings directed by the Court or the U.S. Trustee as required in section 342 of the Bankruptcy Code and Bankruptcy Rules 2002(a) and (f).

79.     I believe that using the Claims and Balloting Agent to promptly provide notices to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, the Claims and Balloting Agent will assist the Debtors in preparing creditor lists and mailing initial notices, and therefore, it is more efficient to authorize the Claims and Balloting Agent to mail the Notice of Commencement of these chapter 11 cases. Further, coordinating the mailing of notices through a single source, the Claims and Balloting Agent, will reduce the opportunities for dissemination of conflicting or confusing information to parties in interest. Accordingly, the Claims and Balloting Agent should undertake such mailings.

80.     Based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**F.      Conditional Approval of Disclosure Statement, Plan, and Solicitation Procedures Motion**

81.     The Debtors request entry of an order (i) scheduling the combined hearing on confirmation of the Plan and the adequacy of the Debtors' Disclosure Statement and setting related deadlines, (ii) conditionally approving the *Disclosure Statement for the Joint Plan of Reorganization for Alea Holdings US Company and Its Debtor Affiliates* (the "Disclosure Statement"), (iii) approving the (a) voting and solicitation procedures, (b) combined hearing

notice, (c) form and manner of publication notice, and (d) form of ballots and release opt-out form, and (iv) granting related relief.

82.     I believe the schedule of proposed dates (the "Confirmation Schedule") is achievable and will best maximize value for the benefit of all stakeholders. I believe that the Confirmation Schedule enables the Debtors to emerge from chapter 11 as quickly as the Court's schedule and the requisite notice periods will permit, while also providing for the best avenue for the Debtors to reorganize (or otherwise consummate a value-maximizing sale transaction).

83.     Specifically, I believe that the facts and circumstances of these chapter 11 cases necessitate the Debtors' proposed timeline. As the Debtors have the support of key stakeholders for a plan that maximizes the value of the Debtors' assets, implementing the restructuring transactions contemplated by the Plan in a timely manner that complies with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and Complex Case Procedures is in the best interests of the estate, creditors, and all stakeholders.

84.     As such, I believe that the relief requested in the Conditional Approval of Disclosure Statement, Plan, and Solicitation Procedures Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, it is my opinion that the Conditional Approval of Disclosure Statement, Plan, and Solicitation Procedures Motion should be approved.

**G.     Bar Date Motion**

85.     Pursuant to the Bar Date Motion, the Debtors seek entry of an order: (i) setting bar dates for filing proofs of claim; (ii) approving form and manner for filing proofs of claim; (iii) approving notice of bar dates; and (iv) granting related relief.

86.     The  Debtors seek to establish: (a) a general bar date of August 26, 2026 (the "General Bar Date"); and (b) an amended schedules bar date, to the extent applicable, to be the later of (i) the General Bar Date and (ii) twenty-one (21) days from the date on which the Debtors mail notice of an amendment to the schedules (such date, the "Amended Schedules Bar Date") (collectively, the "Bar Dates").

87.     I believe that the proposed timeline will give all parties in interest adequate notice of the Bar Dates and an opportunity to respond, while preceding the Voting Deadline (as defined in the Conditional Approval of Disclosure Statement, Plan, and Solicitation Procedures Motion) such that the Debtors will have certainty as to the universe of claimants prior to the Voting Deadline.

88.     Given the timing of this case, I believe that the proposed Bar Dates timeline is sufficient and necessary. I believe that implementation of the procedures and deadlines set forth in the Bar Date Motion is necessary and appropriate to give all parties the confidence they need to effectuate the restructuring transactions contemplated by the Plan. Accordingly, I believe the relief requested by the Bar Date Motion should be granted.

### H.      Financing Motion

89.     In the weeks preceding the Petition Date, Province, with my involvement, analyzed the Debtors' forecasted cash flows and liquidity needs in a chapter 11 scenario.  Based on that analysis, the Debtors require two forms of relief: (i) use of the Prepetition Facility Lender's cash collateral (as defined in the Financing Motion, "Cash Collateral") on an interim basis (pursuant to the "Interim Financing Order"); and (ii) authority to incur incremental postpetition financing (up to $35 million, the "Postpetition Commitment," and the facility providing it, the "Postpetition

31

Facility") upon entry of a final order approving the Financing Motion (the "Final Financing Order").

90.     Accordingly, the Debtors seek authority, pursuant to the Financing Motion, to immediate and continued access to the liquidity necessary to preserve estate value, maintain ordinary-course operations, fund the costs of administering these chapter 11 cases, pursue approval and consummation of the ANAIC and NAICC sales, and implement the transactions contemplated by the RSA and the Plan. The requested relief also provides adequate protection to the Prepetition Facility Secured Parties (as defined in the Financing Motion) for the Debtors' consensual use of Cash Collateral and, subject to entry of the Final Financing Order, authorizes access to the Postpetition Facility if additional liquidity is needed.

91.     ***Use of Cash Collateral.***  As of the Petition Date, the Debtors hold approximately $7,300 of unrestricted cash.  All of the Prepetition Obligors' cash constitutes the Prepetition Facility Lender's collateral, and the Debtors have no revenue or access to cash otherwise.  The Prepetition Facility Lender has consented to the Debtors' use of Cash Collateral on the terms provided in the Interim Financing Order, including the Debtors' compliance with a weekly budget and the swift progression of these Chapter 11 Cases.  Based on anticipated cash needs, the Debtors expect cash on hand to be sufficient to fund the interim period without additional borrowing.

92.     The Debtors' use of Cash Collateral is necessary to preserve the value of their estates. Without immediate access to Cash Collateral, the Debtors would be unable to fund operating and administrative expenses, including funding the professional fee escrow required by the terms of the Interim Financing Order and ensuring sufficient liquidity to manage their insurance subsidiaries' operations pending the consummation of the ANAIC and NAICC sales and the SPARTA settlement with PIC.  On the other hand, I do not believe the Debtors have any viable

32

alternative to consensual Cash Collateral use.  The Debtors have no unencumbered assets, and no alternative financing source, to provide the necessary liquidity to fund these Chapter 11 Cases. Accordingly, I believe that the Debtors' access to Cash Collateral is necessary and appropriate to the maximization of the Debtors' estate.

93.     As adequate protection for the Debtors' use of Cash Collateral and for any diminution in value of the Prepetition Facility Secured Parties' interests in the Prepetition Collateral, the Financing Motion and the proposed Financing Orders provide the Prepetition Facility Secured Parties with, among other things, replacement liens, superpriority administrative expense claims, the payment of certain fees and expenses, and information and budget-compliance covenants, in each case as more fully set forth in the Financing Motion and the proposed Financing Orders.

94.     ***Postpetition Financing.***  Although the Debtors anticipate that their cash on hand should be sufficient to fund at least the start, if not the whole, of these Chapter 11 Cases, the Debtors do not have sufficient cash on hand to fund distributions under the Plan.  If the Debtors are able to consummate the pending sales of ANAIC and/or NAICC, the sale proceeds (which would also constitute the Prepetition Facility Lender's collateral) could be used to fund distributions under the Plan (*i.e.*, the $20 million cash pool to be paid to the TruPS Holders pro rata).  Otherwise, or if the Debtors require additional liquidity during the pendency of these Chapter 11 Cases for administrative expenses, the Debtors have secured access to $35 million in additional postpetition capacity under their existing Prepetition Facility subject to certain conditions (most importantly, entry of the Final Financing Order) (the "Postpetition Facility" provided by the "Postpetition Facility Lender").  Approval of the Postpetition Facility provides a necessary liquidity backstop, ensuring that the Debtors can address unexpected case costs or timing

33

delays in the sale transactions without disrupting the Plan process. I believe the Postpetition Facility is reasonable and the best alternative available to the Debtors to fund these Chapter 11 Cases and the Plan.

95. As the Debtors' Chief Restructuring Officer, I oversaw the Debtors' efforts to secure postpetition financing. Prior to the commencement of these Chapter 11 Cases, the Debtors canvassed alternative sources of financing. None offered an actionable proposal, let alone terms comparable to what the Prepetition Facility Lender was willing to offer. This outcome was unsurprising. Substantially all of the Debtors' assets are already encumbered by the Prepetition Facility, including most crucially the stock (and proceeds thereof) of ANAIC, NAICC, and SPARTA. The cash needs are relatively small. And the prospects for recovery are uncertain and relatively defined (*i.e.*, there is limited upside for a third party to step in). Accordingly, based on my experience, I do not believe any third party would have been willing to extend unsecured credit or a priming facility to the Debtors on terms as favorable as those offered by the Postpetition Facility Lender.

96. Notwithstanding that the Postpetition Facility Lender is an affiliated entity, I believe that the Postpetition Facility is reasonable and appropriate. The Debtors and the Postpetition Facility Lender negotiated the economics, covenants, and other terms at arm's-length and in good faith, over several rounds of proposals and counterproposals, and the Debtors improved certain terms relative to the Postpetition Facility Lender's initial proposal. The Postpetition Facility Lender was also at all times advised by separate counsel. And, entry into the Postpetition Facility was overseen and approved by the Independent Director through the Special Committee.

97.     In my view, the terms of the Postpetition Facility, taken as a whole, are fair and reasonable and are the most favorable terms available to the Debtors under the circumstances. Most notably, the Postpetition Facility Lender has agreed that the Postpetition Facility will receive the same treatment as the Prepetition Facility under the Plan and need not be repaid in full in cash on the Effective Date if the chapter 11 plan contemplated by the RSA is consummated—a benefit that no third-party lender offered or, in my experience, would be expected to offer.

98.     The Postpetition Facility Agreement also includes certain milestones and the "Significant Provisions" identified in section C, paragraph 8 of the *Procedures for Complex Cases in the Southern District of Texas*. The milestones were a condition to the Postpetition Facility Lender's commitment and were themselves negotiated at arm's-length; I believe they afford the Debtors sufficient time to pursue confirmation of the Plan and to consummate the ANAIC and NAICC sales.

99.     For these reasons, and based on my experience and my involvement in the negotiations, I believe that the Debtors' use of Cash Collateral and entry into the Postpetition Facility are necessary, reflect a sound exercise of the Debtors' business judgment, and are in the best interests of the Debtors' estates and their stakeholders.

## I.      Request for Emergency Consideration Motion

100.     Pursuant to the Request for Emergency Consideration, the Debtors request emergency consideration of the following motions: the Notice of Designation as Complex Case; Claims Agent Retention Application; Creditor Matrix Motion; Omnibus Relief Motion; Interim Financing Motion; Bar Date Motion; and Solicitation Procedures Motion.

101.     I believe that failure to approve the relief requested in these respective motions would cause immediate and irreparable harm to the Debtors. I believe that emergency

consideration of such motions is warranted to ensure that these chapter 11 cases are administered efficiently for the benefit of all stakeholders.

***

37

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  July 19, 2026

/s/ *Peter Kravitz*
Name: Peter Kravitz
Title: Chief Restructuring Officer